I: OSGOOD CARLETON et al., Appellants, *v.* LOMBARD, AYRES & COMPANY, Respondent.*

1. SALE BY MANUFACTURER OF GOODS — IMPLIED WARRANTY. A manufacturer who sells goods of his own manufacture impliedly warrants that they are free from any latent defect growing out of the process of manufacture.

2. IMPLIED WARRANTY — WRITTEN CONTRACT. Implied warranties may attach to a written as well as to an unwritten contract of sale.

3. REFINED PETROLEUM — SALE — DESCRIPTION — LATENT DEFECTS. The delivery of refined petroleum of the brand, color, test and specific gravity called for by a written contract between the purchaser and the manufacturer does not satisfy the contract unless the oil was free from latent or hidden defects that rendered it unmerchantable at the time and place of delivery, and that could have been avoided or guarded against in the process of refinement, or in the selection of material by reasonable care and skill.

4. REFINED PETROLEUM — INSPECTION — ACCEPTANCE — EFFECT AS TO LATENT DEFECTS. An acceptance of refined petroleum under a contract describing the brand, color and fire test, made by an inspector under the rules of a produce exchange, which make the acceptance operate as an acknowledgment that the goods are in accordance with the contract, does not relieve the manufacturer from liability for latent defects which render the oil unmerchantable, unless they would appear upon the inspection.

5. JUDGMENT — EVIDENCE AGAINST THIRD PARTY. A judgment against a purchaser of goods for damages on account of defects therein is, so far as the issues in the cases are identical, admissible in his favor in a subsequent action by him against his vendor, who was notified of and participated in the trial of the former action.

6. JUDGMENT — PAROL EVIDENCE AS TO ISSUE DECIDED. Parol proof is admissible to show the questions actually litigated and decided in a former action, when the judgment therein is admitted in evidence.

7. JUDGMENT — EVIDENCE TO PROVE PART OF CASE. The fact that a judgment does not prove the entire case of a plaintiff, who offers it in evidence, does not render it inadmissible if it proves any material fact of his case.

8. EVIDENCE — MANUFACTURER'S KNOWLEDGE OF DESTINATION OF GOODS. Evidence that the manufacturer of refined petroleum knew from the manner in which the goods were packed, as well as from other sources, the destination to which they were to be sent by his vendee, is admissible on the question of his liability for latent defects therein which render the goods unmerchantable.

· *Carleton* v. *Lombard, Ayres & Co.*, 78 Hun, 616, reversed.

(Argued March 9, 1896; decided April 7, 1896.)

* See opinion on denial of motion for re-argument, 149 N. Y. 601.

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made May 18, 1894, which affirmed a judgment in favor of defendant dismissing the complaint, entered upon a decision of the court on trial at Circuit.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James C. Carter* and *R. Burnham Moffat* for appellants. The contract of January 10, 1887, between the parties hereto was an executory contract for the sale of oil to be manufactured by the defendant. (*C. I. Co.* v. *Pope*, 108 N. Y. 233.) Upon an executory contract for the sale of goods by a manufacturer, the law implies a warranty which will survive acceptance that the goods sold are free from concealed defects resulting from the process of manufacture. (*Hoe* v. *Sanborn*, 21 N. Y. 552; *White* v. *Miller*, 71 N. Y. 118; *Studer* v. *Bleistein*, 115 N. Y. 316; *Mody* v. *Gregson*, L. R. [4 Exch.] 49.) The so-called implied warranty against latent defects does not rest upon any presumed intent of the parties to the contract, but is imposed by law as an obligation or duty on the part of the manufacturer. It is properly classified among the *quasi* contracts. (*Hoe* v. *Sanborn*, 21 N. Y. 552; *White* v. *Miller*, 71 N. Y. 118; *Hertzog* v. *Hertzog*, 29 Penn. St. 467; *People ex rel.* v. *Speir*, 77 N.Y. 150; *O'Brien* v. *Young*, 95 N. Y. 430; 2 Schouler on Personal Prop. 334.) The judgment roll in the *Graham* suit was competent evidence between the parties to this action, and its exclusion was error. (*Bell* v. *Merrifield;* 109 N. Y. 211; *Stowell* v. *Chamberlain*, 60 N. Y. 277; *Morgan* v. *Winston*, 2 Swan, 472; *Fake* v. *Smith*, 7 Abb. Pr. [N. S.] 106; *B. P. Co.* v. *Garrison*, 6 Daly, 246; *Konitzky* v. *Meyer*, 49 N. Y. 571; *Heiser* v. *Hatch*, 86 N. Y. 614; 3 Phil. on Ev. 817; Freeman on Judg. § 187; *Robbins* v. *City of Chicago*, 4 Wall. 657; *Pierson* v. *Crooks*, 115 N. Y. 539.) There was evidence tending to show that the defects in the oil at the time of shipment were concealed defects, and upon that question the case should have been submitted to

the jury.   The refusal to submit it was error.   (Story on Sales,. § 368.)   The obligation here asserted against the defendant may be enforced notwithstanding an acceptance of the oil by the plaintiffs upon a mutually satisfactory certificate of inspection. (*Dustan* v. *McAndrew*, 44 N. Y. 76 ; Russell on Arbit. [7th ed.] 61 ; *Mody* v. *Gregson*, L. R. [4 Ex.] 49.)

*B. F. Tracy* for respondent.   There was no implied warranty.   (55 N. Y. S. R. 333 ; *Baldwin* v. *Van Deusen*, 37 N. Y. 487 ; *Parkinson* v. *Lee*, 2 East, 314 ; *Budd* v. *Fairmaner*, 8 Bing. 48, 52 ; *Dickson* v. *Zinzinia*, 10 C. B. 602 ; *Deming* v. *Foster*, 42 N. H. 165 ; *Whitmore* v. *S. B. Iron Co.*, 84 Mass. 52 ; *McParlin* v. *Boynton*, 8 Hun, 449 ; 71 N. Y. 604 ; *Dustan* v. *McAndrew*, 44 N. Y. 76 ; *Bartlett* v. *Hoppock*, 34 N. Y. 118 ; *O. B. & F. G. Co.* v. *Gunther*, 31 Fed. Rep. 208.)   But conceding, for the sake of the argument, that the law in this case will imply a manufacturer's warranty against concealed defects arising in the process of manufacture, the plaintiffs offered no proof of the breach of such warranty.   The judgment roll in the case of *Graham* v. *Carleton* was inadmissible for any purpose.   It was incompetent ; the defendant was not a party to the record and was not bound by it.   (*Studer* v. *Bleistein*, 115 N. Y. 316 ; *Zabriskie* v. *C. V. R. R. Co.*, 42 N. Y. S. R. 629 ; *Pierson* v. *Crooks*, 115 N. Y. 539 ; *Smith* v. *Moore*, 7 S. C. 209.)

O'BRIEN, J.   The plaintiffs sought to recover damages in this action for the breach of an executory contract for the sale of goods.   The defendant is a domestic corporation, engaged in refining crude petroleum for sale and export, and both parties to the action were members of the New York Produce Exchange.   On the 10th of January, 1887, the parties entered into a contract in writing, which, by its terms, was made subject to the rules of the exchange, whereby the defendant agreed to sell and deliver to the plaintiffs a large quantity of refined petroleum.   The following is the material part of the contract in which the kind, quantity and price of

the goods are specified, as also the time and place of delivery, in these words :

"Fifty-five thousand cases, ten per cent more or less, each case packed with two of their patent cans, with low screw tops or nozzles and brass labels, containing five gallons each of refined petroleum of their Stella brand, color standard white or better, fire test 76 degrees Abel or upwards, at eight and one-half cents per gallon, cash on delivery. To be delivered in yard free of expense to vessel, to be ready not earlier than the twenty-fifth January, 1887, not later than the tenth of February, 1887, with twenty-five days to load. Brass labels one-half of one cent each."

It appears that before closing this contract the plaintiffs had received from the firm of Graham & Co., merchants at Calcutta, British India, an offer to purchase a like amount of refined petroleum of the same brand, color, test and packing, to be shipped at the port of New York, not later than March 15, 1887, for their account and risk, on board the British ship Corby, bound for Calcutta. This offer the plaintiffs accepted on the same day that they entered into the contract with the defendant, and immediately after closing it. On or before March 1, 1887, the defendant delivered the oil, packed in the manner specified in the contract, to the plaintiffs, alongside the Corby at its factory at Bayonne. The delivery by the defendant to the plaintiffs, and by the plaintiffs to their vendees in Calcutta, was thus accomplished by substantially the same act. The rules of the Produce Exchange, which were made part of the contract between the plaintiffs and the defendant, so far as material to the questions involved, were these : (1) The committee on petroleum were authorized and required to license duly qualified inspectors, members of the exchange, for the various branches of that business. (2) Buyers should have the right of naming the inspector, but must do so at least five days before the maturity of the contract. Failing in this, the seller might employ any regular inspector at the buyer's expense, and his certificate that the oil is in conformity with the contract shall be accepted. (3)

When goods are delivered to vessel by buyer's orders, the acceptance of them by buyer's inspector shall be an acknowledgment that the goods are in accordance with the contract.

The plaintiffs under the rule named the inspector, who on March 1, 1887, after the cargo was loaded on board the Corby, made and delivered to them a certificate in writing which certified that he had inspected the oil shipped on board the Corby, and stated therein the brand, color, test and gravity of the same which corresponded with the contract. The vessel started upon her voyage, the plaintiffs paid the defendant the purchase price of the oil and then drew upon the parties in Calcutta to whom they had sold, for the price as between them, and their draft was paid. The vessel did not arrive at Calcutta till some time in June, and when she began to discharge the cargo it was found that the cans had become corroded from the inside by some foreign substance in the oil, and so perforated that they did not retain their contents. A large part of the oil was lost by leakage, and the whole cargo was pronounced unmerchantable and finally sold at Calcutta for a small sum, for account of whom it might concern. When the condition of the goods was discovered by the consignees during the discharge of the cargo from the ship, the plaintiffs were notified by cable of the situation and the condition of the oil. They laid these dispatches before the defendant and a long correspondence by cable followed in which the defendant participated and of all of which it had knowledge. The purpose of it was to ascertain the defect, if any, in the oil and to reach some amicable arrangement. In the end all parties seem to have become satisfied that a large loss had been sustained, and the parties in Calcutta who had paid the plaintiffs for the property called upon them to make good their contract. The plaintiffs in turn called upon the defendant to indemnify them from loss, and it then took the ground that it had in all respects performed its contract and was not liable for the result.

In July, 1888, Graham & Co., in Calcutta, brought suit in

the Supreme Court in New York against the plaintiffs to recover their damages. The complaint in the action, after alleging the legal obligation of these plaintiffs to deliver to them a merchantable article of refined petroleum at the port of New York fit for export and transportation by sea in a sailing vessel to India, averred that, in fact, it was not a merchantable commodity, but on the contrary a very large portion of the cans so shipped contained petroleum imperfectly refined, containing water, acids and other foreign substances which would, in the course of transportation, corrode the cans and should have been eliminated therefrom by proper refinement, and the presence of which rendered the article shipped unmerchantable and unfit for transportation. There were various other breaches of the contract alleged not material to state. Notice was given to the defendant to come in and defend the action and it complied with the notice. It participated in the preparation of the defense, the production of proofs, and at the trial was represented by counsel and had every opportunity to resist the claim. The jury, however, rendered a verdict for the plaintiffs in the action and against the defendants, who are the plaintiffs here, upon which a judgment was entered for nearly $50,000. The plaintiffs in this action, upon the refusal of the defendant to indemnify them, paid this judgment and called upon the defendant to reimburse them, and upon its refusal, this action was commenced in March, 1891.

The complaint alleges, as did that in the prior suit, substantially that the oil delivered by the defendant alongside the Corby at Bayonne was not in fact refined merchantable petroleum, but, on the contrary, the cans contained a large proportion of oil imperfectly refined and containing foreign substances, which would in the course of transportation corrode the cans, and which should have been eliminated by proper refinement, the presence of which rendered the goods unmerchantable and unfit for transportation. That in consequence of this defect the cans, with few exceptions, had become corroded and perforated by the action of the contents,

so that they would not, and did not, retain it, and hence could not be delivered as an article of merchandise or commerce at the port of destination. That these defects were latent and of a hidden nature, and such as could not have been discovered by inspection or any examination that was practicable for the buyers to make at the time and place of delivery. The pleading then states with considerable detail the correspondence by cable after the arrival of the Corby at Calcutta; the defendant's connection with it; the action brought against them by the Grahams; the issues therein; the verdict and judgment, and the payment of the same by the plaintiffs who were defendants in that action. The action having been brought to trial, a verdict was directed in favor of the plaintiffs, but the judgment was reversed at the General Term upon a construction of the contract unfavorable to the plaintiffs, and upon exceptions taken at the trial, and a new trial was ordered. On the new trial the plaintiffs' complaint was dismissed on the rulings of the General Term made when the first judgment was before it for review. On the second appeal that court adhered to its former ruling and affirmed the judgment.

The property which was the subject-matter of the contract between the parties was not in existence at the time it was made, but was thereafter to be produced by refinement of the crude material through a manufacturing process by the defendant. It was, therefore, a contract by a dealer with a manufacturer, and is subject to the rules and principles that apply to executory contracts for the sale and delivery of goods when the parties occupy these relations to each other. It is a conceded fact in the case that the oil delivered by the defendant to the plaintiffs alongside the Corby was of the kind and quality described in the written contract. In quantity, brand, color and fire test it corresponded with the terms of the contract; but it is claimed that while all this is true, yet there was a latent or hidden defect in the article so delivered, the result of improper refinement or manufacture, not discernible upon inspection, which rendered the oil unmer-

chantable and unfit for transportation by sea in a sailing vessel, and that this defect was the cause of the loss which the plaintiffs have sustained. The most important question in the case is whether the defendant, notwithstanding its written contract, is bound to make good the loss, assuming that it was caused by such defect in the goods. The general rule of the common law, expressed by the maxim *caveat emptor*, is not of universal application, though the exceptions are quite limited; and one of them is the case of a manufacturer who sells goods of his own manufacture, who, it is said, impliedly warrants that they are free from any latent defect growing out of the process of manufacture. The seller in such a case is liable for any latent defect arising from the manner in which the article is manufactured, or from the use of defective materials, of the character of which he is shown or is presumed to have knowledge. This rule and the reasons upon which it rests, or its qualifications and limitations, have seldom been stated in the same form by courts and writers upon the subject, but that it exists as a principle in the law of contracts cannot be doubted.

The leading case in this state is *Hoe* v. *Sanborn* (21 N. Y. 552). The learned judge who framed the opinion in that case, after stating the rule, proceeds to show the grounds upon which it rests. In his view, while this peculiar obligation is called a warranty for convenience, it does not rest upon any supposed intention of the parties or agreement in fact, but is one which the law raises upon principles foreign to the contract in the interest of commercial honesty and fair dealing, and analogous to those upon which vendors are held liable for fraud. It is quite difficult to reconcile the authorities upon the question, but it may be observed that they recognize the principle that in such cases the seller and buyer do not deal with each other quite at arm's length; that the seller possesses superior knowledge on the subject upon which the buyer is presumed to repose some degree of confidence, and that commercial honesty and fair dealing requires that in such cases the seller be held bound to deliver the article free from secret

or latent defects which are actually or presumptively within his knowledge.

The principle was applied, in a later case in this court, to a contract for the sale of seeds of a particular description by the grower. It was there said that as the grower of seeds must be presumed to be cognizant of any omission or negligence in cultivation, whereby they were rendered unfit for use, there was the same reason for implying a warranty that they were not defective from improper cultivation, as in the case of a sale of an article by a manufacturer that it is free from latent defects. ( *White* v. *Miller*, 71 N. Y. 118.)

The latest case that I have been able to find upon the question is *Kellogg Bridge Company* v. *Hamilton* (110 U. S. 108). The leading cases bearing upon the point, both in this country and England, are there reviewed, and the court stated the principle in these words: " When the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process, and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker by his occupation holds himself out as competent to make articles reasonably adapted to the purpose for which such or similar articles are designed.

" When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely on the judgment of the seller, who was the manufacturer and maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use."

19

The principle is distinctly admitted in the opinion of the learned court below, and I do not understand that it is denied by the learned counsel for the defendant. It is strenuously urged, however, that it can have no application to a case like this where the contract is in writing with such ample description of the goods sold. But the obligation attached to an executory contract for the sale of goods by the manufacturer or maker, cannot be changed by the mere fact that the contract has been reduced to writing. The writing, it is true, is deemed to express the whole agreement of the parties, but since this peculiar liability arises from the nature of the transaction and the relations of the parties, without express words or even actual intention, it will remain as part of the seller's obligation unless in some way expressly excluded. All implied warranties, therefore, from their nature, may attach to a written as well as an unwritten contract of sale. The parties may, of course, so contract with each other as to eliminate this obligation from the transaction entirely. The seller may by express and unequivocal words exclude it and, in like manner, the buyer may waive it. So, also, the parties may provide for a delivery or inspection of the article when made, which will operate to extinguish the liability upon acceptance. (*McParlin* v. *Boynton*, 8 Hun, 449; *S. C.*, 71 N. Y. 604.) In this case the parties did provide for an inspection of the oil. The scope and effect of that provision of the contract will be considered hereafter, but, aside from that, there was no language used indicating any intention on the part of the buyer to waive or the seller to exclude the liability of a manufacturer.

The proposition upon which the case turned in the court below, and upon which the judgment is defended here, was thus stated by the learned judge in the opinion at General Term: " It is well settled that when an article is sold under a contract which specifies the qualities which it shall possess —no matter whether the language be a condition or a warranty — that the law will not, except in special cases, imply a warranty or condition that the article has other qualities. A

warranty or condition in a contract of sale that the article sold has certain qualities, excludes the implication of a warranty or condition that it possesses other qualities." From the operation of this general proposition it will be seen that the learned judge excepts special cases, which, however, are not designated. In its application to this case the rule thus stated must mean that since the parties have in their contract specified the particular brand, color and fire test of the refined petroleum which was the subject of the sale, the manufacturer's obligation to deliver an article free from latent defects, arising from the process of manufacture which would render it unmerchantable, has been excluded by implication. This is not, we think, the meaning of the rule to which the learned judge referred in the language quoted. The rule means that where parties to a contract of sale have expressed in words the warranty by which they intend to be bound, no further warranty will be implied by law, but that expressed will include the whole obligation of the seller. (Benjamin on Sales, § 666; *Deming* v. *Foster*, 42 N. H. 165.) Moreover, this principle applies to sales of specific existing chattels and not ordinarily to sales of goods to be made or supplied upon the order of the buyer. There is much confusion in the cases on this subject, arising doubtless from an inaccurate use of the term warranty.

When an article is sold by the owner or maker by the particular description by which it is known in the trade it is a condition precedent to his right of action that the thing which he has delivered, or offers to deliver, should answer this description. But in many cases in modern times the sale of a particular thing by terms of description has been treated as a warranty, and the breach of such a contract a breach of warranty, whereas it would be more correct to say that it was a failure to comply with the contract of sale which the party had engaged to perform. (*Chanter* v. *Hopkins*, 4 M. & W. 404; Benjamin on Sales, § 600.) There are many cases in which such words of description are not considered as warranties at all, but conditions precedent to any obligation on the

part of the vendee, since the existence of the qualities indicated by the descriptive words, being part of the description of the thing sold, becomes essential to its identity, and the vendee cannot be obliged to receive and pay for a thing different from that for which he contracted. (Smith's Leading Cases, vol. 2 [6th Eng. ed.], 27; Schouler's Personal Property, vol. 2, pp. 352, 353.) The tendency of the recent decisions in this court is to treat such words as part of the contract of sale descriptive of the article sold and to be delivered in the future, and not as constituting that collateral obligation which sometimes accompanies a contract of sale and known as a warranty. (*Reed* v. *Randall*, 29 N. Y. 358; *Coplay Iron Co.* v. *Pope*, 108 N. Y. 232, 236.)

It is not now important to inquire how far, or under what circumstances, the principle stated by the learned judge applies to contracts of sale of goods in *esse* between dealers in which there is an express warranty. It is not, we think, applicable to the obligation of a manufacturer who contracts, as in this case, for a sale of his own product, the condition of which he is presumed to know. It is plain that in the case at bar the plaintiffs intended to buy and the defendant to sell an article of refined petroleum, which should not only correspond to the description in the contract, but should be free from latent defects arising from the process of manufacture, so as to constitute a thing which, in the commercial sense, would be of some use or value.

It is quite conceivable that the oil might correspond with all the descriptions of the contract, and yet be a useless and unmerchantable thing, in consequence of defects arising from the process of manufacture, in which case the buyer would have the shadow of the thing bought without the substance. The defendant's obligation rests not only upon the terms of the contract, but upon its superior knowledge and the confidence which the buyer placed in its ability to produce a proper article, and hence the relations of the parties are quite different from that of dealers in the article in the market, each possessing equal means of information and opportunity

for the detection of latent defects. A strict adherence to the bare descriptive words of the contract would not express the full obligation of the defendant. That the commodity shall be so free from latent defects arising from the process of refining, and which could be guarded against by ordinary care, so as to render it merchantable, is a term to be implied in all such contracts. (Story on Cont. [4th ed.] §§ 836, 837; *Jones* v. *Just*, L. R. [3 Q. B.] 197.)

The plaintiffs were entitled to something more than the mere semblance or shadow of the thing designated in the contract. They were entitled to the thing itself with all the essential qualities that rendered it valuable as an article of commerce and free from such latent defects as would render it unmerchantable. (*Mody* v. *Gregson*, L. R. [4 Ex.] 49.) If the goods in question were in fact unmerchantable in consequence of latent defects arising from the process of manufacture and which the defendant could have guarded against by the exercise of reasonable care, it would be quite unreasonable to hold that the defendant has, nevertheless, performed the contract because it has delivered oil of the same brand, color and test specified. It is quite clear that the words of the written contract do not exclude a liability on the part of the defendant for fraud in the performance, and it is difficult to see how it can affect an obligation of the seller who is also a manufacturer, which is based upon his actual or presumed knowledge of latent defects in the oil, arising from the process of refinement.

In the construction of commercial contracts for the sale and delivery of goods, the courts are not always bound by the literal meaning of words, descriptive of the article, contained in the contract. It frequently happens in large transactions that the article which is the subject of the contract is described by some vague generic word which, taken strictly and literally, may be satisfied by a worthless or defective article. In such cases the words may mean more than their bare definition or literal meaning would imply and impose upon the seller an obligation to furnish not only the thing

mentioned in the contract, but a merchantable article of that name. (*Murchie* v. *Cornell*, 155 Mass. 60.)

If it be true that the defendant in this case delivered alongside the vessel an article which was unmerchantable and unfit for transportation, in consequence of hidden or latent defects arising from the process of manufacture and of which it had or should have had knowledge, in the exercise of reasonable care, it has not, in any just or substantial sense, performed its contract, although the article so delivered was of the brand, color, test and specific gravity called for by the writing. The plaintiffs were not only entitled to the thing described, but to that thing in such condition and so free from hidden defects as to make it available to them as an article of commerce and fit for transportation.

Whether this liability survived the delivery and inspection of the goods remains to be considered. When the rules of the exchange are read into the contract it is provided that the acceptance of the petroleum by the buyer's inspector shall be an acknowledgment that the goods are in accordance with the contract and, as we have seen, the inspector so certified. The inspector was not the agent of either party, but an umpire selected to determine whether the article delivered alongside the Corby corresponded with the contract. The parties, in effect, submitted a certain question to the decision of the inspector, and that was whether the oil corresponded in brand, color and fire test with the contract. He was not authorized to determine whether there was or was not any hidden or latent defects in the article at the time and place of the delivery which would render it unmerchantable. That question was not within the fair scope or purpose of the inspection, and the certificate on this point does not conclude the parties. If, however, the defects which the plaintiffs now claim existed at the time of delivery and which they claim to have produced the damages, were discernible upon the inspection contemplated by the contract, they were not hidden or latent defects within the meaning of the rule, and in that case the certificate would conclude the parties. If in

executing the power to determine the brand, color, fire test and gravity of the article delivered, any other defect which would render it unmerchantable would necessarily appear, the plaintiffs are concluded as to that defect by the certificate of the inspector. (*Studer* v. *Bleistein*, 115 N. Y. 316; *Monitor Milk Pan Co.* v. *Remington*, 41 Hun, 218.)

If I am right in these several propositions, it must follow that the plaintiffs were entitled to prove upon the trial, if they could, that the refined petroleum delivered by the defendant alongside the Corby, though corresponding with the description of the article in the contract, had in it some hidden or latent defect, not discernible by the inspection provided for, which then and there rendered it unmerchantable.

At the trial the plaintiffs' counsel offered in evidence the judgment roll in the action against them by Graham & Co., already referred to, as proof upon some of the issues in the case. He also offered to prove what actually took place at that trial and what questions were actually litigated and submitted to the jury. The evidence was objected to by the counsel for the defendant, excluded by the court, and the plaintiffs' counsel excepted.

We have seen that the defendant had knowledge of all the correspondence by cable between the plaintiffs and the parties in Calcutta; that it was notified of the commencement of the action, and that it participated in the trial. In so far as the issues actually litigated in that case are identical with the issues involved in this, the judgment is binding upon the defendant in the same way as if it had been a party upon the record. (*O. T. N. Co.* v. *C. T. E.*, 144 N. Y. 665; *Village Port Jervis* v. *First National Bank*, 96 N. Y. 550; *City of Rochester* v. *Montgomery*, 72 N. Y. 65; *Albany City Savings Inst.* v. *Burdick*, 87 N. Y. 40, 45; *Andrews* v. *Gillespie*, 47 N. Y. 487; *Heiser* v. *Hatch*, 86 N. Y. 614; *Chicago* v. *Robbins*, 2 Black, 418.) What the plaintiffs sought to prove by this record was that at the time of delivery of the petroleum by the defendant alongside the Corby it was not properly refined, but contained water, acid and other foreign substances

that rendered it unmerchantable, and that, in consequence, they were cast in damages at the suit of the parties in Calcutta, the delivery in both cases being substantially identical in point of time, and the amount of the damages. Graham & Co. could not have recovered against the plaintiffs for any change or deterioration in the oil after it was delivered, or that was due to the voyage, or the perils of the sea, since the goods were at their risk. The plaintiffs offered to prove that the recovery did not proceed upon the ground of any express warranty or any other ground embraced within the pleadings other than the unmerchantable condition of the oil when delivered at the vessel. They were not confined to the record in order to show the point passed upon, but could show by parol proof what questions were actually litigated and decided. (*Doty* v. *Brown*, 4 N. Y. 71; *Kerr* v. *Hays*, 35 N. Y. 331; *Bell* v. *Merrifield*, 109 N. Y. 211; *Adams* v. *Conover*, 87 N. Y. 429; *Smith* v. *Smith*, 79 N. Y. 634; *Lewis* v. *O., N. & P. Co.*, 125 N. Y. 348; *Shaw* v. *Broadbent*, 129 N. Y. 114; *Davis* v. *Brown*, 94 U. S. 423; *Russell* v. *Place*, Id. 606.) It is quite true that the record would not prove that the defects were latent or such as would not be disclosed by the inspection contemplated by the contract, since that question was not involved on the former trial, and the plaintiffs did not offer it for that purpose. It could not be excluded, however, because it did not prove the plaintiffs' entire case. If it proved any material fact in support of it, it was admissible. It did, we think, establish, as against the defendant, the fact that the oil, when delivered alongside the Corby, was unmerchantable, since that was the ground upon which the parties in Calcutta recovered the damages, as we must assume from the present condition of the record. The plaintiffs were of course bound to show by other proof that the defects which rendered the goods unmerchantable were latent, and such as would not be disclosed by the inspection.

The plaintiffs offered some proof at the trial tending to show that the defendant, from the manner in which the goods were packed as well as from other sources, knew the destination of

the cargo in question, but it was objected to and excluded under exception. We think that the proof was admissible. It was a circumstance surrounding the transaction, not conflicting with the terms of the contract, and might have some bearing on the defendant's obligation to deliver an article of refined petroleum free from latent defects that would render it unmerchantable and upon the degree of care that it was bound to use to that end.

One of the qualities which the oil in question should possess was forty-four degrees Beaume, specific gravity. This was introduced into the contract by the adoption of the rules of the exchange. It is quite possible that an article of commerce, such as petroleum, possessing all the qualities and sustaining all the tests specified in this contract, may be a merchantable commodity according to the custom of the trade, irrespective of any other consideration or of any latent defect. But that proposition is one of fact rather than law, and, if true, it is difficult to see how a recovery could have been had, upon the grounds stated, by the parties in Calcutta. The defendant having had an opportunity to litigate that question once may be bound by the result, but, in any event, it cannot be affirmed as matter of law, upon the evidence in the record, that the article delivered was merchantable.

Our conclusions with respect to the questions in the case may be briefly summarized.

1. The defendant was bound to deliver an article of refined petroleum that was free from latent or hidden defects that rendered it unmerchantable at the time and place of delivery and that could have been avoided or guarded against in the process of refinement or in the selection of the raw material by reasonable care and skill.

2. This obligation survived the acceptance if the latent defects were such as would not appear upon an inspection to ascertain whether the oil delivered corresponded with that described in the contract.

3. The judgment roll in the former action was admissible
20

in evidence for the purpose and upon the ground already stated.

4. The plaintiffs were entitled to show that the defendant knew the destination of the cargo of oil designated in the contract.

The judgment must, therefore, be reversed and a new trial granted, costs to abide the event.

All concur.

Judgment reversed. _____